IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

PENNY M. M.[1]                          )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )      Case No. 17-cv-01024-CJP[2]
                                        )
COMMISSIONER OF SOCIAL                  )
SECURITY,                               )
                                        )
                    Defendant.          )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), Penny M. M. (Plaintiff) seeks judicial
review of the final agency decision denying her application for Disability Insurance
Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. §
423.

## Procedural History

Plaintiff applied for DIB and SSI in April 2014, alleging a disability onset
date of November 30, 2013. (Tr. 199-200, 209-16). Her application was denied
at the initial level and again upon reconsideration. (Tr. 95-96, 133-35). Plaintiff
requested an evidentiary hearing, which Administrative Law Judge (ALJ) Janice
E. Barnes-Williams held on July 6, 2016. (Tr. 38-70). The ALJ reached an
unfavorable decision in October 2016. (Tr. 21-31). The Appeals Council denied
Plaintiff's request for review, rendering the ALJ's decision the final agency

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect
his privacy. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties
pursuant to 28 U.S.C. § 636(c). See Doc. 31.

decision. (Tr. 1-4). Plaintiff exhausted her administrative remedies and filed a timely Complaint in this Court. (Doc. 1).

## Issues Raised by Plaintiff

Plaintiff argues the ALJ failed to adequately evaluate how her headaches, carpal tunnel syndrome (CTS), obstructive sleep apnea (OSA) and vertigo impacted the Residual Functional Capacity (RFC) assessment.

## Applicable Legal Standards

To qualify for SSI and/or DIB, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically

be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The ALJ's Decision

ALJ Barnes-Williams followed the five-step analytical framework set forth above. She determined Plaintiff met the insured status requirements through December 31, 2018 and had not engaged in substantial gainful activity since November 30, 2013. (Tr. 23). Plaintiff had severe impairments of obstructive sleep apnea, diastolic dysfunction, hypothyroidism, depression, anxiety, history of carpal tunnel syndrome, bilateral wrist arthritis, right hip arthritis, mild right shoulder arthritis and possible tendinosis, dizziness/vertigo, obesity, headaches, including migraine headaches, and a respiratory impairment. (Tr. 23). Plaintiff's impairments did not meet or equal a listing but she was limited to light work with additional limitations. (Tr. 25-26). Plaintiff was unable to perform any past relevant work based on this RFC. (Tr. 29). However, she was able to perform other jobs that existed in significant numbers in the national economy. (Tr. 30). Accordingly, the ALJ found Plaintiff not disabled. (Tr. 30).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### 1. Agency Forms

Plaintiff completed her initial disability and function reports in April 2014. She stated that her conditions caused severe pain in her head, sensitivity to light and sound, nausea, vomiting, dizziness, lightheadedness, joint paint, joint stiffness, joint swelling, numbness, tingling, chronic fatigue, weakness, difficulty concentrating and focusing, painful and frequent urination, bloating, chronic groin pain, and chronic sinus pain. Plaintiff took medications for her ailments, which resulted in dry mouth, drowsiness, and an upset stomach. She could not sit, stand, walk, climb, lift, carry, bend, kneel, squat, or reach for extended periods. She had to frequently alternate positions and had difficulty using her hands. She had problems sleeping at night and took breaks and naps throughout the day. (Tr. 260). Plaintiff could sit for two hours before needing to get up. She rested for 10 to 15 minutes after any activity. (Tr. 270).

On an average day, Plaintiff woke up around 5:30 a.m. to let her dogs outside then went back to bed until 11:00 a.m., when she ate lunch. She watched television or read throughout the day, took a shower, ate dinner, and went to bed around 9:00 p.m. (Tr. 261). She had to sit down to get dressed to avoid standing, wore slip-on shoes to avoid bending, avoided clothing with buttons,

snaps, and zippers, and wore pajamas unless she had to go somewhere because she lacked motivation. Plaintiff took short showers because she could not stand for long periods. She avoided bending and had problems holding onto the soap and squeezing shampoo bottles. She only showered every other day because it was exhausting. She also avoided styling her hair because of problems standing. (Tr. 262).

Plaintiff prepared simple meals such as cereal and sandwiches on a daily basis. Bending to reach cabinets was difficult and she struggled to lift and carry pots. Moving around the kitchen, standing at the counter, and using kitchen utensils was also difficult. She washed laundry once a week for 30 minutes, with breaks, vacuumed an hour a week, with breaks, and dusted an hour each month, with breaks. (Tr. 263). Plaintiff avoided driving when she took her medication. She only drove short distances due to a lack of concentration and dizziness. She had difficulty sitting in the car for long periods, applying pressure to the pedals, and gripping the wheel. (Tr. 264).

Plaintiff had problems following verbal instructions because of poor concentration and short-term memory. She needed written instructions and had to refer back to them several times while attempting to complete a task. (Tr. 267). She had issues twisting lids, opening food packages, and picking up coins, and shook while holding onto a pen or pencil. (Tr. 270).

Plaintiff updated her agency forms in December 2015. She stated she had anxiety and depression, which caused irritability, angry outbursts, and a lack of

motivation. (Tr. 277). In April 2015, Plaintiff indicated her household chores only included washing laundry for 30 minutes every week, with breaks. (Tr. 288).

### 2. Medical Records

Plaintiff saw Dr. James Simmering for primary care during the alleged disability period. Plaintiff presented to Dr. Simmering on July 29, 2013 and reported dizziness. Dr. Simmering assessed Plaintiff with fatigue/malaise and vertigo. He instructed her to get eight to nine hours of sleep at night and avoid taking daytime naps. (Tr. 454-58). Plaintiff returned to Dr. Simmering on August 5 and 16, 2013 and October 1, 2013 with complaints of dizziness. Dr. Simmering assessed her with vertigo. (Tr. 460-73). Plaintiff followed-up with Dr. Simmering on October 21, 2013 and reported dizziness, which she described as a lightheaded, spinning, and swimming sensation. Dr. Simmering previously increased Plaintiff's Verapamil to 180 mg, but she still experienced dizziness and headaches. Dr. Simmering instructed Plaintiff to follow-up with another doctor and noted Plaintiff was off work until she could do so. (Tr. 475-79).

Plaintiff followed-up with Dr. Simmering on November 19, 2013 and complained of dizziness. She had been off work since November 11, 2013 and planned to return to work November 15, 2013. Dr. Simmering assessed her with vertigo and noted that another physician was going to prescribe her Nortriptyline. (Tr. 482-87).

Plaintiff saw Dr. Simmering on December 4, 2013 and complained of recurring headaches and dizziness that started upon wakening. She rated the

severity of her headache pain at a nine out of ten. Her symptoms included vertigo and vomiting. The headaches were associated with stress. Aggravating factors included anxiety, bright lights, head positions, and noise. Darkness and massages relieved her symptoms. Dr. Simmering noted that Plaintiff was seeing another doctor for vertigo and headaches and he prescribed Plaintiff amitriptyline. Plaintiff stopped taking the medication after two weeks. She had an appointment with a neurologist. She could not work due to headaches. (Tr. 488-92).

Plaintiff saw Dr. Sylvia Awadalla, a neurologist, on January 23, 2014. Plaintiff reported two years of dizziness, which she described as light-headedness. She constantly had a sense of movement in the back of her eyes. Another physician prescribed her Verapamil, which helped the vertigo and spinning, but did not prevent the visual symptoms. When she bent over, she saw white spots for seconds at a time. When she moved her eyes or head, she felt like she had to refocus her vision. Plaintiff was afraid to drive with those sensations. She had migraines her entire life and a constant ache in the left eye. She had more severe headaches once every two weeks, associated with nausea, vomiting, and photophobia. The migraines lasted up to 26 hours. Plaintiff tried taking Topamax but could not tolerate it. She took Cymbalta for chronic back pain, which did not help her dizziness. Verapamil helped briefly, but it stopped working. Nortriptyline kept her up for two weeks straight and was of no benefit.

Plaintiff had sleep apnea but could not tolerate CPAP.[4]  On examination, Plaintiff was able to follow simple and complex commands.  Fine finger movements were equal bilaterally and there was no drift.  Dr. Awadalla assessed Plaintiff with obstructive sleep apnea, dizziness, and migraine headaches.  Dr. Awadalla was most concerned that Plaintiff's symptoms were due to untreated sleep apnea.  She encouraged Plaintiff to try sleep medicine and work on tolerating her CPAP machine.  (Tr. 367-69).

Plaintiff followed-up with Dr. Brendan Lucey for sleep apnea on January 24, 2014.  Dr. Lucey noted Plaintiff was diagnosed with severe obstructive sleep apnea in January 2012.  Plaintiff had not used PAP therapy for a year due to mask discomfort with air leaks.  Plaintiff reported multiple symptoms including daytime sleepiness, headaches, vision changes, dizziness, memory problems, and decreased mood.  Dr. Lucey opined that all of these symptoms were related to sleep apnea.  He instructed Plaintiff to restart APAP and pursue weight loss with diet and exercise, and referred Plaintiff for a mask fitting.  (Tr. 818-20).

Plaintiff presented to Dr. Brett Grebing, an orthopedic surgeon, on January 29, 2014 for worsening moderate bilateral wrist pain that occurred intermittently.  Lifting and movement aggravated Plaintiff's pain, while ice relieved her pain.  Associated symptoms included nocturnal awakening and numbness.  On examination, Plaintiff demonstrated maximum tenderness to palpation in her

---

[4] Continuous positive airway pressure, or CPAP, is "a method of positive pressure ventilation used with patients who are breathing spontaneously, in which pressure in the airway is maintained above the level of atmospheric pressure throughout the respiratory cycle.  The purpose is to keep the alveoli open at the end of exhalation and thus increase oxygenation and reduce the work of breathing.  DORLAND'S ONLINE MEDICAL DICTIONARY, (32nd. ed. 2012), https://www.dorlands.com/dorlands/index.jsp.

wrists. Plaintiff was positive for Valgus stress and Basal joint grind on both wrists. Her pinch and grip strength of both wrists were reduced. X-rays of her wrists showed well-aligned joints, minimal degenerative changes, and mild thumb CMC degeneration with well-preserved alignment. Dr. Grebing assessed Plaintiff with degenerative thumb CMC arthritis. He administered an injection in her wrists and advised her to take over the counter anti-inflammatories. (Tr. 341-45).

Plaintiff saw Dr. Rachel Darken on January 30, 2014 for a mask fitting for her CPAP machine. (Tr. 816).

Plaintiff presented to Dr. Simmering on March 11, 2014 and reported dizziness. She was taking Valium, which helped her symptoms. Dr. Simmering assessed her with headaches and carpal tunnel syndrome. He instructed Plaintiff to take her carpal tunnel medication as prescribed, exercise, and attempt to maintain an ideal body weight. Dr. Simmering noted that another doctor was treating Plaintiff's migraine headaches. (Tr. 494-99).

Plaintiff followed-up with Dr. Simmering on April 1, 2014. She complained of dizziness and rated the severity at a 10. She said it occurred persistently and was worsening. Dr. Simmering referred Plaintiff to a neurologist. (Tr. 502-06).

Plaintiff saw Dr. Lucey on April 8, 2014 for sleep apnea. She stated she had other symptoms such as headaches, mild daytime sleepiness, and dizziness. Dr. Lucey told Plaintiff sleep apnea could cause unrefreshing sleep and excessive daytime sleepiness. Dr. Lucey encouraged Plaintiff to remain compliant with PAP, monitor symptoms of headaches, and partake in exercise. (Tr. 811-14).

Plaintiff presented to Dr. Awadalla on April 14, 2014 and reported she was seeing yellow splotches for seconds at a time. She felt lightheaded. Plaintiff had not experienced vertigo for six months. She was experiencing an ache in her left eye, which became more intense when she had a migraine. She did not get many migraines, which occurred maybe once or twice a month. She took Vicodin to abort her migraines about two to four times each month, which made her nauseous. Cymbalta helped her chronic pain but not her symptoms of vertigo or lightheadedness. Plaintiff only spun with vertigo. On examination, she was able to follow simple and complex commands. Her fine finger movements were equal bilaterally and there was no drift. Dr. Awadalla assessed Plaintiff with dizziness, chronic tension-type headache, and common migraine without aura. Dr. Awadalla opined Plaintiff did not have cluster headaches or epilepsy, which were Plaintiff's concern. He further stated that Plaintiff's migraines and chronic tension-type headaches would be hard to treat because of her poor tolerance of medications. Her lightheadedness could possibly be a result of headaches. Dr. Awadalla recommended Propranolol or Gabapentin, but wanted Plaintiff's primary care physician to make any changes to her medication regimen. (Tr. 364-65).

Plaintiff saw Dr. Simmering on June 17, 2014 and complained of migraines with vertigo. Dr. Simmering noted that Plaintiff wanted to try Inderal. (Tr. 507-12).

On June 27, 2014, Dr. Joseph Billadello wrote to Dr. Simmering to summarize Plaintiff's treatment for vascular issues. Dr. Billadello noted that Plaintiff was still having headaches and started Propranolol for treatment. (Tr. 840-41).

Plaintiff presented to Dr. Simmering on August 12, 2014 and reported dizziness. (Tr. 521-26).

Plaintiff went to the emergency room on August 17, 2014 for chest pain, dizziness, and nausea. She developed a headache in the waiting room. Images of her chest showed no acute process. She was given nitroglycerin and aspirin for acute coronary syndrome, ondansetron for nausea, and diazepam for anxiety. She was discharged to home in stable condition. (Tr. 576-86).

State-agency consultant Dr. Julio Pardo conducted an RFC assessment on September 26, 2014 and found Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. Plaintiff was limited to occasional handling in both hands. She should avoid concentrated exposure to noise, vibration, and hazards. (Tr. 90-92).

Plaintiff presented to Dr. Grebing on December 17, 2014 and complained of right hip pain. Examination of Plaintiff's wrists were normal. Range of motion (ROM) was normal and pain free, bilaterally. Plaintiff demonstrated maximum

tenderness over the thumb CMC. She was positive for basal joint grind and Valgus stress on both wrists. Dr. Grebing assessed her with De Quervain's disease and degenerative CMC arthritis of the thumb. Plaintiff declined a cortisone injection. Dr. Grebing advised her to continue with relative rest and immobilization of the thumb as needed. (Tr. 681-85).

Plaintiff saw Dr. Simmering on February 11, 2015 and complained of dizziness with associated symptoms of headaches, incoordination, and nausea. Dr. Simmering ordered diagnostic evaluations, including a computed tomography of both internal auditory canals. (Tr. 544-48).

Plaintiff received a CT scan of her temporal bones on March 10, 2015. The images showed no abnormalities or evidence of semicircular canal dehiscence. (Tr. 558-59).

Plaintiff returned to Dr. Simmering on April 27, 2015 and reported dizziness, headaches, and nausea. Plaintiff's tests of her auditory canals were not in her chart. (Tr. 549-54).

Dr. Sandra Bilinsky, another state-agency consultant, conducted an RFC assessment on May 14, 2015 and concurred with Dr. Pardo's determinations. (Tr. 125-27).

Dr. Jean Swearingen was Plaintiff's primary care physician throughout a portion of the relevant period. (Tr. 873-905). Plaintiff presented to Dr. Swearingen on July 30, 2015 and reported a cough. She also requested Dr. Swearingen complete a disability form. Plaintiff said she had been off work for

two years due to persistent vertigo and associated nausea. Some days she was unable to get out of bed. She also had difficulty concentrating. (Tr. 799). Dr. Swearingen completed a medical source statement and opined Plaintiff could sit for six hours in an eight-hour workday and could stand/walk for three hours in an eight-hour workday. Plaintiff needed to alternate between sitting and standing throughout the day. She could use her hands adequately for simple grasping, repetitive motion tasks, and fine manipulations. Plaintiff could frequently live up to 10 pounds, occasionally lift up to 20 pounds, and never lift more than 20 pounds. She could never stoop or crouch. Dr. Swearingen expected Plaintiff's conditions to last for at least 12 months. (Tr. 795).

Plaintiff presented to Dr. Swearingen on September 17, 2015 and was positive for dizziness on neurological examination. (Tr. 878-82).

On November 18, 2015, Plaintiff saw Dr. Swearingen and reported vertigo. (Tr. 886).

Plaintiff presented to the emergency room on June 22, 2016 for chest pain. She complained of a mild headache, but it was not significant. She reported that she occasionally got dizzy. Images of Plaintiff's chest showed no acute cardiopulmonary disease. (Tr. 1041-68).

Plaintiff underwent a sleep study on June 30, 2016. She complained of loud snoring, gasping for breath at night, witnessed apneas, excessive nighttime sweating, and frequent episodes of falling asleep during the day. She had difficulty with daytime functioning due to sleepiness. She experienced anxiety,

muscle tension, and kicking the night with unpleasant crawling. Plaintiff was assessed with severe obstructive sleep apnea syndrome with inadequate titration, mild desaturation, fragmented sleep with delayed sleep onset and multiple awakenings during sleep, and a history consistent with restless leg syndrome. The doctor noted Plaintiff required a repeat CPAP/BiPAP titration due to an inadequate CPAP titration. (Tr. 1074-76).

## Analysis

Plaintiff contends the ALJ's RFC assessment was erroneous because she did not adequately address the medical record related to Plaintiff's vertigo, headaches, carpal tunnel syndrome, and obstructive sleep apnea.

The ALJ opined that Plaintiff's complaints of vertigo and headaches were not as limiting as she alleged. In reaching this conclusion, the ALJ relied on treatment notes from April 2014, where Plaintiff reported she had not experienced vertigo for six months, her medications helped her migraines, and she only had migraines once or twice each month. The ALJ further opined that Plaintiff's "reports to her doctor show that her complaints were not continuous or as severe as alleged." The ALJ also relied on Dr. Swearingin and state-agency consultants who opined Plaintiff was capable of performing light work despite her conditions. (Tr. 27).

Plaintiff first asserts the treatment note stating she had not experienced vertigo for six months was an error because the same note states Plaintiff felt lightheaded, "only spins with vertigo," and Cymbalta helped Plaintiff's chronic

pain but did not alleviate her symptoms of vertigo or lightheadedness. (Tr. 807). It is not apparent whether the note contained an error or not. As the Commissioner points out, dizziness is a symptom of vertigo but the two terms are not interchangeable from a medical standpoint.[5] Thus, Plaintiff could have been experiencing dizzy spells but not vertigo. Ultimately, it is up to the ALJ, not this Court, to interpret the medical evidence, *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004), and it was not unreasonable or illogical for the ALJ to accept the medical source's statement as written.

The ALJ also provided a fair and accurate summary of the medical evidence related to Plaintiff's vertigo and headaches. For instance, she acknowledged that throughout the record "the claimant report[ed] ongoing headaches and vertigo. . ." (Tr. 27). The ALJ also summarized Dr. Simmering's note from October 2013, which stated Plaintiff should remain off work for about a month until she followed up with another doctor for her vertigo. The ALJ then pointed to Plaintiff's reports of headaches in December 2013 as well as her complaints of dizziness in January, April, and August 2014. (Tr. 24).

An ALJ need not mention every piece of evidence as long as she does not ignore an entire line of evidence contrary to her ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Plaintiff does not direct the Court to a line of evidence the ALJ ignored that contradicts the ALJ's conclusions. Nor

---

[5] According to Dorland's, vertigo is "an illusory sense that either the environment or one's own body is revolving. . .The term is sometimes erroneously used to mean any form of dizziness[,]" which is defined as "a sensation of unsteadiness." DORLAND'S ONLINE MEDICAL DICTIONARY, (32nd. ed. 2012), https://www.dorlands.com/dorlands/index.jsp.

does Plaintiff show that the ALJ mischaracterized the record. Moreover, the ALJ sufficiently articulated her reasons for rejecting Plaintiff's complaints of vertigo and headaches. In sum, this aspect of the disability determination was not in error.

Plaintiff also contends the ALJ erroneously omitted Plaintiff's diagnosis of obstructive sleep apnea from the RFC assessment. However, the ALJ specifically noted at Step 2 that "the claimant was assessed with diastolic dysfunction, obstructive sleep apnea and obesity in June 2014." (Tr. 24). Although the ALJ did not mention obstructive sleep apnea at Step 4 when she determined Plaintiff's RFC, an ALJ is not required to reiterate evidence throughout the opinion because doing so would be "redundant." *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). Notably, there are very few treatment notes specifically related to Plaintiff's sleep apnea in the record, so the ALJ cannot be faulted for providing a brief analysis. "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004).

Plaintiff next argues the ALJ's analysis of her wrist problems was deficient because the ALJ failed to acknowledge treatment records that corroborate her complaints. The ALJ opined,

> [A]lthough the claimant has a diagnosis of arthritis of her bilateral wrists, the medical evidence does not support the degree of functional limitations alleged by the claimant. The record indicates it only [sic] mild in severity . . . and there were no significant findings regarding a history of carpal tunnel syndrome. Medical reports showing only minimal problems discounts [sic] the degree and

intensity of claimant's subjective complaints of hand pain. Both Dr. Swearingin and the State agency medical consultants opined that the claimant could perform some light work. . .

(Tr. 27).

Plaintiff contends the ALJ should have specifically highlighted certain findings in Dr. Grebing's treatment notes, including bilateral surgical scars from carpal tunnel release surgery, bilateral crepitus, left palpation-maximum tenderness, bilateral mid-wrist thumb CMC, positive bilateral valgus stress, positive bilateral basal joint grind, decreased pinch and grip strengths, positive bilateral median nerve compression, and positive Tinel's on the right. However, the ALJ referenced the treatment notes containing these findings and acknowledged Dr. Grebing's suggestion that Plaintiff use a brace and limit her gripping and grasping. Moreover, Dr. Grebing described the vast majority of these findings as "normal" so it is unclear how any error in the ALJ's summary of the record would alter the RFC assessment. Overall, the ALJ mentioned the relevant evidence supporting Plaintiff's position. In addition to acknowledging Dr. Grebing's suggestion, the ALJ referred to an x-ray from January 2014 that showed mild arthritis in both of Plaintiff's wrists. The ALJ ultimately categorized Plaintiff's arthritis and carpal tunnel syndrome as severe impairments and limited her to frequent handling and fingering. All-in-all, the ALJ's opinion indicates she considered all of the evidence and she built a logical bridge from the evidence to her conclusions.

Finally, Plaintiff argues the ALJ should have asked the vocational expert whether unscheduled daily breaks for naps and less-than frequent handling and fingering would affect full-time competitive employment. However, "[t]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007).

The ALJ, here, opined, "While the claimant indicated that she naps throughout the day, the record does not show that taking naps is medically necessary nor has a doctor recommended it. In fact, Dr. Simmering, her primary care physician, suggested the claimant get 8 or 9 hours of sleep, avoid daytime naps, and exercise." (Tr. 28). This consists of substantial evidence to reject Plaintiff's allegations. "An ALJ must only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (internal quotations and citations omitted). The ALJ met this burden here.

Moreover, as set forth above, the ALJ reasonably found that Plaintiff could perform frequent handling and fingering. Thus, the ALJ was not obligated to include limitations he did not include in the RFC in the hypotheticals to the vocational expert.

ALJ Barnes-Williams did not commit any reversible errors in determining Plaintiff's RFC or reaching a disability determination. It is evident from the

written opinion that the ALJ considered all of the relevant portions of the record and her conclusions were logical and based on substantial evidence.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:  August 1, 2018.**

<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITD STATES MAGISTRATE JUDGE**